IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EMANUEL REDDEN,           )
                          )
         Plaintiff,       )
                          )  Civil Action No. 05-241-GMS
vs.                       )
                          )
CORRECTIONAL OFFICER DIEZ,)
                          )
                          )
         Defendant        )

       Deposition of EMANUEL W. REDDEN, JR., taken pursuant to notice at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, beginning at 10:08 a.m., on Wednesday, January 17, 2007, before Allen S. Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

    ERIKA Y. TROSS, ESQUIRE
    DEPUTY ATTORNEY GENERAL
    DEPARTMENT OF JUSTICE
    STATE OF DELAWARE
    820 North French Street
    Wilmington, DE 19801

    For - Defendant

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Page 2

1
2      EMANUEL W. REDDEN, JR.,
3      the deponent herein, having first been
4      duly sworn on oath, was examined and
5      testified as follows:
6           EXAMINATION
7  BY MS. TROSS:
8  Q   Good morning, Mr. Redden. We are here for Emanuel
9  Redden versus Lauro Diaz, Case No. 05-241. I represent the
10 State of Delaware, Lauro Diaz. And I just want to explain
11 to you a couple of ground rules and a little bit about a
12 deposition.
13      As you may know, a deposition is part of
14 discovery. I will be asking you a series of questions and
15 your answers will be given under oath subject to the laws
16 relating to perjury. You can object to any question I ask
17 but you still must answer the question.
18      The transcriptionist or court reporter will be
19 taking down all of my questions and all of your answers.
20 Therefore, we have to speak one at a time because the court
21 reporter cannot take down what is being said if we are
22 talking over one another.
23      Also, all responses must be verbal. The court
24 reporter cannot take down a nod of the head or say uh-huh.

Page 3

1  So please say yes or no if the question requires a yes or no
2  answer.
3       I will assume that if you answer a question,
4  you have understood the question. If you do not understand
5  a question, ask me for clarification before you answer.
6       A couple of other things. You are allowed to
7  take breaks. If you need to take a break or use the
8  bathroom, please let me know.
9       I will give you time at the end to add anything
10 you think I should know that we did not cover.
11      And, finally, I need to know if you're taking
12 any medication or drugs which cloud your judgment or prevent
13 you from understanding questions and giving true answers.
14 A   No, ma'am.
15 Q   Okay.
16 A   I'm just tired.
17 Q   What is your full name?
18 A   Emanuel W. Redden, Jr.
19 Q   Have you ever used any other names or aliases?
20 A   Yes, ma'am, in my lifetime.
21 Q   Could you please --
22 A   There is a whole bunch of them.
23 Q   Go ahead and go through them.
24 A   Charles Gillespie, James Barber, Anthony Johnson,

Page 4

1  Michael Macon. I think that should be it.
2  Q   Okay. Have you ever gone by any nickname or street
3  name?
4  A   Yes, ma'am.
5  Q   Could you go ahead and give me that?
6  A   Soko, S-o-k-o.
7  Q   Did you bring anything with you to this deposition?
8  A   Yes, ma'am.
9  Q   Could you tell me what you brought?
10 A   The original filing or duplicate copies of the
11 filing that I filed against Officer Diaz.
12 Q   So the complaint?
13 A   Yes, ma'am.
14 Q   Okay. Did you review anything in preparation for
15 this deposition?
16 A   Well, just what I had there.
17 Q   Which is --
18 A   The original filing that I filed in Federal Court,
19 the State District Court of Delaware in 1983.
20 Q   Okay. So your complaint?
21 A   Yes, ma'am. That's all I have.
22 Q   Have you ever been deposed before?
23 A   No, ma'am.
24 Q   Have you ever testified in court before?

Page 5

1  A   Yes, ma'am.
2  Q   When?
3  A   During criminal trials or something like that?
4  Q   Just any time?
5  A   Yes, ma'am. Back in the sixties when I was in the
6  Black Panthers and in D.C., Washington, D.C., when I was
7  going to trial down there.
8  Q   Okay. Have you ever filed a civil lawsuit besides
9  this one?
10 A   Yes, ma'am.
11 Q   In what court?
12 A   In the Federal Court in New Jersey.
13 Q   And when was that?
14 A   That was back in I think around 1989.
15 Q   And why did you file the previous lawsuit?
16 A   Well, when I was over in super max in Pennsylvania,
17 the guard jumped on me over there when I was handcuffed and
18 shackled and beat me and broke my ribs, knocked my teeth out
19 and injured my eye real bad, my left eye.
20 Q   And what was the outcome of your previous lawsuit?
21 A   Well, what happened, after I was beaten in
22 Pennsylvania, they sent me to Trenton, New Jersey super max.
23 And then when it's time for me to go to trial, they came and
24 took a deposition of me and then the day before the trial,

EMANUEL W. REDDEN, JR.

Page 6

1  they said I was too dangerous to take across state lines
2  from Jersey to Pennsylvania. So the deposition, they took
3  with a video. They played before the jury, you see. And
4  they just asked me certain questions like you're asking me
5  now. But when the guard got on the stand, they made
6  statements that I said I was going to kill them and rape
7  their kids and all that there, you see, but I wasn't there
8  to rebut anything at all. So I lost the case.
9     Q  Okay.
10   A  Because I couldn't be there physically.
11   Q  Okay. At the time you filed this lawsuit against
12 Officer Diaz, did you have any other lawsuits pending in
13 either State or Federal Court?
14   A  No, ma'am.
15   Q  What is your date of birth?
16   A  6/21/50.
17   Q  And where were you born?
18   A  In Wilmington, Delaware.
19   Q  Where did you grow up?
20   A  In Wilmington.
21   Q  Prior to your incarceration, where did you live?
22   A  In Wilmington, Delaware.
23   Q  And how long were you a resident in Wilmington?
24   A  All my life. Since I was born.

Page 7

1    Q  With whom did you live?
2    A  My mother.
3    Q  What is your highest level of education?
4    A  9th grade.
5    Q  And where did you attend the 9th grade?
6    A  P. S. DuPont.
7    Q  What was the last full-time job you held prior to
8  your incarceration?
9    A  I was working in Columbia, South Carolina, with the
10 city.
11   Q  And when was that?
12   A  That was during the period when I was on escape from
13 '81 to '82.
14   Q  And what was your responsibility?
15   A  I worked for the water department, you know, putting
16 down fire hydrants.
17   Q  What was your rate of pay at that job?
18   A  The cost of living was real low down there. So
19 every two weeks, I was making about $290.
20   Q  Are you currently married?
21   A  No, ma'am.
22   Q  Do you have any children?
23   A  Yes, ma'am.
24   Q  How many children?

Page 8

1    A  Six children.
2    Q  In what institution are you currently being housed?
3    A  In Smyrna.
4    Q  What's the name of --
5    A  Delaware Correctional Center.
6    Q  And how long have you been in Delaware Correctional
7  Center?
8    A  Altogether?
9    Q  During this present period.
10   A  Since 2000, June 2000.
11   Q  Okay. And what other housing locations have you
12 been at since June of 2000?
13   A  Down in Georgetown. I went down to Georgetown in
14 June of 2004 where the incident took place.
15   Q  When you say Georgetown, do you mean Sussex
16 Correctional?
17   A  Yes, ma'am.
18   Q  Okay. Now we are going to get into a little bit
19 about your complaint. Who is Lauro Diaz?
20   A  That's the officer that I filed a complaint against.
21   Q  Why is he a defendant in this lawsuit?
22   A  Because of what originated with Sergeant Dukes and
23 Officer Walker. It transpired in the same building.
24   Q  But why did you file the lawsuit against Officer

Page 9

1  Diaz?
2    A  Well, you want me to tell you the whole history of
3  the thing with him?
4    Q  Yes, please.
5    A  All right. Sergeant Dukes is the sergeant of that
6  building where I hurt my leg at.
7    Q  Okay.
8    A  And so they rotate every other week he might work in
9  the morning and then one week he work in the night.
10   Q  When you say he, who are you referring to?
11   A  Sergeant Dukes.
12   Q  Okay.
13   A  So he ran the building. So Officer Diaz came on
14 working one night and I was playing Pinochle and I was
15 sitting in the same spot like I'm sitting here now. He came
16 down here and took his right elbow and winged me upside my
17 neck. I mean, you know, with a proper blow.
18       So by me sitting out in the hallway playing
19 Pinochle and the other guys on the other side, I looked back
20 to see if he had room to get by me, which he did. So after
21 he left, I went up there and called his superior officer,
22 Sergeant Biles, and I explained to Sergeant Biles that
23 Officer Diaz just assaulted me with his forearm. And
24 Sergeant Biles stood in the door with another officer, whose

Page 10

1  name I don't remember. And Diaz was coming out to go by.
2     So as I was explaining to Sergeant Biles what
3  happened, he just laughed. And Sergeant Biles said, I want
4  to see you in the office. So Diaz just laughed and
5  snickered and went on in the office.
6     So then Sergeant Biles came out. I said, what
7  happened? He said, I talked to him and that's the best I
8  can do, you see.
9     So I filed a grievance against him, which you
10 should have a copy of that because I sent you paperwork on
11 that. And they conducted an investigation.
12    So when I got my appeal back from Mr. Howard,
13 the bureau chief, he upheld my grievance against him. So
14 after that transpired, I filed my civil suit.
15 Q  Okay.
16 A  But I filed it after he locked me up from the Duke
17 situation. After I filed a grievance, I seen Lieutenant
18 Attallian when I was going to medical for injury to my leg
19 and explained to him what happened. And so they came over
20 there. When I came back from medical, a couple days later,
21 they locked me up on the charge of two charges of group
22 demonstration and inciting a riot and put me in behavior
23 modification because I filed the grievances.
24 Q  So you're claiming you were put in behavior

Page 11

1  modification because you filed these grievances?
2  A  Yes, ma'am. Yes, ma'am. I have been locked up ever
3  since.
4  Q  Okay. We are going to go through what you told me
5  just from the beginning.
6     First, can you tell me the names of all the
7  correctional officers who were present when you claim the
8  incident occurred on August 28th?
9  A  There were no officers there. I complained to
10 Sergeant Biles. There was only one officer on the tier
11 during count and that was Officer Diaz that came by to
12 count, you know, as they do every half an hour. And then I
13 was on the way out the gate when I called the superior
14 officer because the superior officer was there to open up
15 the gate.
16    I called him to the gate at the time. He had
17 another officer with him, whose name I can't recall. But
18 during the investigation, Lieutenant Johnson found out who
19 his name was but he never gave it to me.
20 Q  So Officer Diaz was there with another officer?
21 A  No. He came down the tier by himself.
22 Q  Okay.
23 A  And after he hit me, I looked back to see if he had
24 enough room to get by. Because I thought it was an

Page 12

1  accident, really, until I looked back and seen he had enough
2  room. Because, ma'am, I mean this cat winged me upside my
3  neck. I mean hard, you know, like a football player when
4  you're playing football. That's how hard he hit me. Then
5  he turned around and went out and I followed him up to the
6  gate where the sergeant was unlocking with the key,
7  unlocking the gate to come out. I told him, this officer
8  just assaulted me. He said who? I said, Officer Diaz just
9  hit me upside my neck for no reason.
10 Q  So Officer Diaz was by himself?
11 A  Yes, ma'am.
12 Q  Now, you say that you were seated at a card table
13 playing Pinochle?
14 A  Yes, ma'am.
15 Q  What time of day was it?
16 A  That was in the night.
17 Q  Do you recall the exact time?
18 A  It had to be around like I'd say 7:30. Around
19 there.
20 Q  What building were you in?
21 A  In medium building.
22 Q  And, again, this was at Sussex Correctional?
23 A  Yes, ma'am.
24 Q  What tier were you on?

Page 13

1  A  I don't know that area down there too good because I
2  was only there for about a week when I got out of the
3  hospital.
4  Q  Okay. Could you describe the tier, what it looked
5  like?
6  A  Yes, ma'am. It was an open, dirty, filthy area.
7  And it had bunk beds like on a wall behind me and bunk beds
8  right up in the front, you know.
9  Q  About how wide was the tier?
10 A  I'd say about the size of this room here.
11 Q  So about --
12 A  From that wall right there to this wall. Because,
13 you know, including the bunks, you know.
14 Q  So about 15 feet, 20 feet?
15 A  I would say that's about 30 feet.
16 Q  Thirty feet?
17 A  Yes, ma'am. From that wall to this wall excluding
18 the bunks. But with the bunk bed out and the card table
19 there, the area then should have been about between me and
20 that locker should have been about four feet.
21 Q  So how many card tables are there?
22 A  There was only one.
23 Q  And how many bunks are there?
24 A  I think it was about double bunks. Maybe about 25

Page 14

1  on that side of the block and 25 on the other side across
2  the hall.
3    Q  So between the card table and the bunk beds, is
4  there a lot of space to walk?
5    A  Yes, ma'am. There is a locker there at the foot of
6  the bed and that's what I looked back at when he went by and
7  there was enough room for him to get by because I was
8  sitting up at the table like this here because there was a
9  dim light overtop of us.
10        So I was sitting up at the table so I could see
11  the cards. Because these are not reading glasses, you see,
12  these are for the distance. So I had to really focus on
13  looking at the cards, you know, because I didn't have my
14  glasses on because I can't see with them on. So there was a
15  dim light there.
16        So I was focused on playing the cards. I was
17  leaning forward. I wasn't leaning back actually in his way,
18  you see. Because the chair that I was sitting on, you know,
19  was a little small chair. So I was leaning forward when he
20  winged me with his right forearm to the neck.
21    Q  Was anyone else sitting with you at the card table?
22    A  Yes, ma'am. New York was sitting to my right.
23    Q  Who?
24    A  New York.

Page 15

1    Q  Can you spell that?
2    A  Like New York City.
3    Q  Is that his nickname?
4    A  Yes, ma'am. That's the only way name I know. I
5  just came on the tier.
6    Q  So you don't know his actual name?
7    A  Right.
8    Q  Do you have an SBI number?
9    A  No. And Salisbury, a brother from Salisbury,
10  Maryland, was sitting to my left.
11    Q  So his name isn't Salisbury, that's where he is
12  from?
13    A  Yes, ma'am.
14    Q  Okay. So you were sitting with a guy whose nickname
15  is New York?
16    A  Yes, ma'am.
17    Q  And a guy whose nickname is Salisbury?
18    A  Yes, ma'am.
19    Q  Okay. But you don't know either of the men's actual
20  names?
21    A  No. Because I just moved to that block because I
22  was in the hospital for a while, you know.
23    Q  Okay.
24    A  So originally when I moved over there, I was only

Page 16

1  there for maybe about two days before they sent me to the
2  infirmary for an injury to my neck. But prior to me being
3  there, I was on the other side of the tier, you see. So I
4  never wasn't really on this block for any period of time.
5    Q  And the three of you were playing Pinochle?
6    A  Yes, ma'am.
7    Q  Before Officer Diaz allegedly hit you, did you see
8  him on the tier?
9    A  No, ma'am.
10    Q  So the first time you saw him was when he hit you?
11    A  Yes, ma'am. Because there was another officer that
12  was working there, too, a black officer. You know, they
13  would rotate. The same officers didn't count all the time
14  coming on the tier. But this was the first time I seen him
15  when he injured me by hitting me in the neck.
16    Q  Do you know why he was on the tier?
17    A  To count. To make a punch. That is punch out there
18  at the back of the wall. And he had to go in there and make
19  his punch.
20    Q  Was this the first time that he had been on the tier
21  to do the count?
22    A  Yes, ma'am. That I seen.
23    Q  Okay. So you claim that Officer Diaz hit you. When
24  Officer Diaz hit you, which direction was he coming from?

Page 17

1    A  He was coming from this direction.
2    Q  So from your right side?
3    A  Yes, ma'am. Because he hit me on the right side of
4  the neck with his right forearm.
5    Q  So he was coming from your right side?
6    A  Yes, ma'am.
7    Q  And he hit you on the right side of the neck?
8    A  Yes, ma'am.
9    Q  With his right forearm?
10    A  With all this here. Like this here. Just here with
11  a hard hit in my neck area, you know.
12    Q  Okay. And it was the right side of your neck?
13    A  Yes, ma'am. I'm not talking about a brushing hit.
14  I'm talking about a hard hit to my neck.
15    Q  Okay. When Officer Diaz allegedly hit you, did he
16  say anything to you?
17    A  He didn't say anything at all.
18    Q  Did you say anything to him?
19    A  No, ma'am.
20    Q  Why didn't you say anything to him?
21    A  Because I knew where it was originating from.
22    Q  Where was it originating from?
23    A  From Sergeant Dukes. See, they was trying to get me
24  to respond in a violent manner, which I didn't do. I went

Page 18

1  and reported him to his superior officer.
2  Q  So you believe Officer Diaz was there at the
3  direction of Sergeant Dukes?
4  A  No. What it was, Sergeant Dukes run that building.
5  He would be there from like I think the time started in more
6  like either 7:00 to 3:00 or 8:00 to 4:00 and then he would
7  rotate and be on the second shift in charge. 4:00 to 12:00,
8  you know, every other week. But his influence and
9  everything is in that building, you see. But not on the
10 12:00 shift, on the 12:00 to 8:00 shift, where Sergeant Sam
11 Hastings runs the building. He doesn't have no influence
12 over him. So he has influence over officers that come in
13 and they knew what happened when I filed a grievance against
14 him and injured my leg, you see.
15 Q  So you're claiming it was retaliation?
16 A  Yes, ma'am.
17 Q  And you believe Officer Diaz knew what was going on?
18 A  Yes, ma'am.
19 Q  And what makes you believe that he knew what was
20 going on between you and Sergeant Dukes?
21 A  Because all of them communicate in the office. All
22 the officers knew about it that came in that building on
23 both shifts, you know.
24 Q  Did the other people at the card table see Officer

Page 19

1  Diaz hit you?
2  A  No.
3  Q  Did they say anything to Officer Diaz?
4  A  No. Because, like I said, there was a dim light
5  there. New York was playing and I was playing. We were so
6  focused on the card game. If you know how to play Pinochle
7  or whatever, it's a game that takes your whole concentration
8  when you're trying to get ahead or get a book or anything.
9  So we was so focused on the game and he came and hit me.
10 You know, that's when I looked back. I wasn't even thinking
11 of any of that, you know. I said, man, this cat just hit
12 me.
13       So the young Spanish brother that was just
14 coming on the tier named Playboy, he said, yeah, that's how
15 he is, you know.
16       And so I said, who was he? And this is when
17 Playboy said, that's Officer Diaz, you know, he is real
18 racist, you know, because I never met Diaz and never knew
19 him. But these guys were on the tier before me, you see.
20 Q  So do you know Playboy's real name?
21 A  No, ma'am. He is a Spanish brother. He went home,
22 though. See, they know you by them names.
23 Q  But Playboy told you it was Officer Diaz?
24 A  Yes, ma'am. That's how I was able to go take his

Page 20

1  name to Sergeant Biles and let him know that Officer Diaz,
2  this officer just assaulted me.
3  Q  And before Playboy told you who Officer Diaz was,
4  you didn't know who Officer Diaz was?
5  A  I never seen him before on that block, you know. At
6  least not while I was there. Because I told you I was there
7  only for a few days after being released from the infirmary.
8  Q  When Officer Diaz hit you, did you say anything like
9  ouch or --
10 A  No. It was sort of a shocking -- a shocking thing
11 that I went through. Because the blow was powerful. I'm
12 saying it was a shocking blow when somebody hit you. There
13 wasn't no ouch or whatever because I'm not an ouch kind of
14 man because I done took some blows before. So when he
15 winged me, you know, I thought I was actually in the wrong.
16 Because that's why I looked back and I thought I was in his
17 way or something, you know, when I seen that he had enough
18 room to get by.
19      He had about this much room to get by between
20 the tier and the locker box that was there. And that's when
21 he turned around and went back up there so I followed him up
22 to the gate when Sergeant Biles was there to let him out.
23 Q  So the way he hit you, you meant he hit you so hard,
24 you didn't react in any kind of way? You weren't ready to

Page 21

1  hit him?
2  A  No, ma'am. Because, see, it was -- when we get into
3  the Dukes deposition, all that will fit right in. But, see,
4  they was harassing me, going to my locker and said, you
5  know, I'm a Muslim, I don't smoke. They said, you just the
6  kind of candidate where they would hide the tobacco at. So
7  they kept raiding my locker all the time. It was a total
8  harassment thing period as long as I was in that building
9  until they moved me out into behavior modification, you see.
10 Q  Did you file a grievance regarding Officer Diaz
11 hitting you?
12 A  Yes, ma'am.
13 Q  And when did you file the grievance?
14 A  On here, I don't have it. On here, it don't have
15 the date.
16 Q  Okay.
17 A  Let me see if I put it in here. The incident
18 happened on the 28th, right, of August, 2004. I had had to
19 file that grievance the next day. It had to be around
20 August 29th somewhere. You might have a copy of this.
21 Because all I got -- because they don't give me no copies of
22 the grievance once you file it like they do here. So all I
23 got is the paperwork right here.
24 Q  Okay.

6 (Pages 18 to 21)

Page 22

1  A  Because here it says September 1st, 2004. Where it
2  said review date. So September 1st, 2004, is when it was
3  filed.
4  Q  Okay. Did you suffer any injury as a result of
5  Officer Diaz allegedly hitting you?
6  A  Not immediately at that time or whatever. Because
7  as I have been growing older, my body has been having like
8  delayed reactions to incidents. You know, like if I bump
9  into something, my body won't hurt or nothing until like
10 maybe two or three days later or something like that, you
11 know. So when my neck started hurting me, I was over on
12 sick call receiving treatment for my knee. So when I told
13 the nurse my neck is bothering me because the officer hit me
14 and everything, so she told me it was probably from the hair
15 follicles in my head making my glands swell up. And I tried
16 to tell her, no, I was hit in the side of my neck. That's
17 why my neck is swelled up, you see. And that's when I filed
18 my grievance, you know. Period.
19 Q  Did she do anything for your neck?
20 A  No, ma'am.
21 Q  Did she give you any medication for your neck?
22 A  No, ma'am. Because I don't take medication like
23 that, any pain pills or whatever like that, you know.
24 Q  How long did the pain last in your neck?

Page 23

1  A  It wasn't like a long-lasting pain. It was a pain
2  that came up like when the swelling came up, it might have
3  lasted maybe about a week of aching.
4  Q  Did you file a sick call slip at any time?
5  A  Well, I was going to sick call every day. So I
6  didn't have to file none. I went over there. Like I said,
7  I think I complained about it a couple days later because it
8  didn't really start bothering me until about two or three
9  days later. That's when I filed the grievance against him.
10 Q  Did you see Officer Diaz hit anyone else on the
11 tier?
12 A  No, ma'am.
13 Q  Did you have any interactions with Officer Diaz
14 before this incident?
15 A  No, ma'am.
16 Q  Did you have any interactions with him after the
17 incident?
18 A  No, ma'am.
19 Q  Okay. We are going to go through a couple of
20 exhibits regarding the incident and your complaint. What
21 I'm going to do is hand them to the court reporter. He is
22 going to mark them and then hand them to you?
23 A  Do you have any copies for me?
24 Q  Well, what will happen is, at the end, you'll get a

Page 24

1  copy of the transcript and the transcript will have copies
2  of the exhibits with it.
3      (Defendant's Deposition Exhibit No. 1 was
4  marked for identification.)
5  BY MS. TROSS:
6  Q  Mr. Redden, the court reporter is handing you
7  Exhibit No. 1. Exhibit No. 1 is the complaint that you
8  filed in this matter. Just take a moment to review it.
9  A  Okay.
10 Q  Keep it. I'm going to ask you some questions based
11 on it.
12 A  I have my copy, too.
13 Q  Let's use this copy since it's marked.
14 A  All right.
15 Q  Have you ever seen this document before?
16 A  Yes, ma'am.
17 Q  This is the complaint you filed in this case,
18 correct?
19 A  Yes, ma'am.
20 Q  Did you draft this complaint?
21 A  Yes, ma'am.
22 Q  Did you write all portions of the complaint?
23 A  Yes, ma'am.
24 Q  Did anyone assist you in writing the complaint?

Page 25

1  A  No, ma'am.
2  Q  Is there anything in your complaint that you would
3  like to change?
4  A  Yeah. Ask for more money.
5  Q  Anything else?
6  A  No, ma'am.
7  Q  Okay. Let's turn to page three, section number
8  four. Could you please read out loud the portion under,
9  Statement of Claim?
10 A  Yes, ma'am.
11 Q  Where it begins, on the night?
12 A  On the night of August 28th, 2004, while sitting at
13 a card table, Correctional Officer Diaz struck me on the
14 right side of my neck intentionally with his right forearm
15 as he was walking past me. I reported the assault to his
16 superior, Sergeant -- supervisor, rather, Sergeant Biles.
17 Q  Keep going.
18 A  I complained that Correctional Officer Diaz just
19 laughed and walked away.
20 Q  Okay. Is what you wrote there true?
21 A  Yes, ma'am.
22 Q  Is it correct?
23 A  Yes, ma'am.
24 Q  Is there anything in your statement of claim that

Page 26

1  you would like to change?
2  A  No, ma'am.
3  Q  So according to this complaint, you were hit by
4  Officer Diaz on August 28th, 2004, correct?
5  A  Yes, ma'am.
6  Q  Now, you also state that Officer Diaz struck you on
7  the right side of your neck intentionally?
8  A  Yes, ma'am.
9  Q  Is it correct that he hit you on the right side of
10 your neck?
11 A  Yes, ma'am.
12 Q  Did he hit you anywhere else?
13 A  No, ma'am.
14 Q  Your complaint states that he hit you intentionally.
15 How do you know he hit you intentionally?
16 A  Because, as I said before, when he hit me, I was
17 leaning forward at the table concentrating on the cards. I
18 wasn't in his way at all. When he struck me on the right
19 side of my neck with his right forearm, I immediately looked
20 back to see if he had enough room to get by. Then he was
21 making the punch. I looked at him while he had his back and
22 everything. When he turned around, I seen who he was.
23 Because I didn't even know who it was at first until he turn
24 around. That is when I said the officer just struck me and

Page 27

1  Playboy was just coming down because this was right -- he
2  was right there where he was making the punch at and he
3  said, yeah, that's Officer Diaz. He is like that. He is
4  real racist, you know.
5  Q  Is it possible that he hit you accidentally?
6  A  No, ma'am. Because, as I said, I'm sitting here
7  with a chair that got a back here. But I'm leaning forward
8  on the table because it was a dim light there. There is not
9  bright light there in the evening. It's a dim light. And
10 so I had to focus in on the cards so I could see the cards
11 because they was old, you know, like dirty and stuff, you
12 know. So sometimes the kings look like the queens and stuff
13 like that, you know. All the face cards. So I was so busy
14 focusing on the cards. I was leaning forward over the
15 table, you see, because I didn't have my glasses on. And
16 there is no way in the world that it could have been an
17 accident because I wasn't in his way in any way, shape or
18 form, you know.
19 Q  Your complaint also states that Officer Diaz hit you
20 with his right forearm?
21 A  Yes, ma'am.
22 Q  How do you know he hit you with his right forearm?
23 A  Because he was coming down on the right side and
24 that's what hit me on my neck, the right forearm. He

Page 28

1  couldn't hit me with his left, you know.
2  Q  But you were focused on the cards, correct?
3  A  Yes, ma'am.
4  Q  So you didn't actually see his right forearm hit
5  you?
6  A  Well, what happened, like I said, I didn't see it
7  coming. But by being such a hard blow, you know, it was
8  there. It wasn't a brushing blow, you know, like brushed
9  past my neck. It was a hard blow there. So I seen it out
10 of the corner of my eye, you know, when it was there, you
11 know.
12       Because, remember, I'm in prison now so I
13 didn't know if it was a prisoner or somebody attacking me or
14 whatever, you know. So I looked, you know.
15       And when I seen it was the officer because he
16 had a blue shirt on just like that gentleman do there, it
17 was a blue shirt. So I seen it was an officer.
18       When he went by, I looked back. I thought I
19 was in his way. That's what I thought. Until I seen the
20 distance between the back of my chair and the locker box.
21 That's when I seen he hit me intentionally. Because he turn
22 around, he had a little like sly grin on his face.
23       He walked past me. He walked up there. That's
24 when I followed him out and superior officer Sergeant Biles

Page 29

1  was at the gate and I told him there while he was just
2  coming through. That's when he snickered and laughed.
3        He said, I want to see you in the office.
4  Because Sergeant Biles is black. You know, down in
5  Georgetown, they don't have respect for the black officers
6  like they do the white officers. So the guy just snickered
7  like it was a game. I want to see you in the office, you
8  know.
9        So later on, I called him, I said, what
10 happened? He said, I talked to him. That's all I could do.
11 That's what Sergeant Biles said. I said, okay.
12 Q  And no one else at the table saw him hit you?
13 A  No, ma'am.
14 Q  Your complaint also states that you reported the
15 incident to Sergeant Biles. How long after the incident did
16 you go to speak with Sergeant Biles?
17 A  I'd say within 60 seconds. I followed the officer
18 up the tier right up to the gate. As soon as he went past
19 me, I followed him up to the gate.
20 Q  Why did you report the incident to Sergeant Biles?
21 A  Because Sergeant Biles was running the building at
22 the time on the 4:00 to 12:00 shift. He was a supervisor.
23 So I reported the incident to him. And then another officer
24 that was with him.

Page 30

1  Q  And what exactly did you say to Sergeant Biles?
2  A  I said, Sergeant Biles, this guy just hit me, man,
3  he just assaulted me, man, you know. I said, he just struck
4  me on the side of my neck, man, for no reason, you know. I
5  explained the situation to Sergeant Biles so he could get a
6  grasp and understanding of what was happening. That's when
7  the guy was going past said I want to see you in the office.
8     Sergeant Biles knowed that I'm a respectful
9  man. He know I don't play no games or anything. So he took
10 me on my word without going through a whole bunch of
11 questions.
12     He took the guy in the office and talked to
13 him. That's what he said.
14 Q  And what did Sergeant Biles say to you specifically?
15 A  He said, I'll talk to him. And that's it.
16 Q  Was Officer Diaz present when you discussed the
17 incident with Sergeant Biles?
18 A  Yes, ma'am. He was just coming through the gate at
19 the time. Sergeant Biles was like holding the gate open for
20 him to go through. So there was a whole gate area. So he
21 was holding the gate open for him to go through and I was
22 standing on the side so I could talk to him. There was
23 another officer there, too, on the side with him.
24 Q  So you all are at the gate?

Page 31

1  A  Yes, ma'am.
2  Q  You're not in Sergeant Biles' office?
3  A  No.
4  Q  When you were at the gate, where is Sergeant Biles
5  standing?
6  A  Well, he is standing there holding the gate open so
7  Diaz could come through. And as Diaz is coming through, I'm
8  standing there saying, this officer just assaulted me, you
9  see.
10 Q  And could Officer Diaz hear you?
11 A  Yes, ma'am. He was right there.
12 Q  About how far away was he standing?
13 A  He was coming through the gate. I was standing
14 there. So we was like no further than this here.
15 Q  So like a foot?
16 A  Well, closer than that. Because I was at the gate
17 and Sergeant Biles was holding the gate open just enough
18 room to come through, you see. And I was at the gate, too.
19 So he had to come right past me. I said, yeah, this officer
20 just hit me, he assaulted me, you know.
21 Q  And what did Officer Diaz say?
22 A  He just snickered and laughed. He didn't say
23 anything when I told him that. When I told Sergeant Biles
24 that he struck me. But when Sergeant Biles said, I want to

Page 32

1  see you in the office, that's when he just snickered and
2  laughed, you know, and went on to the office where he said
3  that.
4  Q  Is it possible he was laughing because he thought
5  you were joking?
6  A  No, because he was taking Sergeant Biles as a joke,
7  you know. That's the way I took it. Because I knew I
8  wasn't joking.
9  Q  Okay.
10    MS. TROSS: Could you please mark this as
11 Defendant's Exhibit No. 2?
12    (Defendant's Deposition Exhibit No. 2 was
13 marked for identification.)
14 BY MS. TROSS:
15 Q  The court reporter just handed you Defendant's
16 Exhibit No. 2. Exhibit No. 2 is a grievance report. Take a
17 moment to review it.
18 A  Okay. See, I never received a copy of this here.
19 Q  So have you ever seen this document before?
20 A  No, ma'am.
21 Q  Does it appear to be related to a grievance that you
22 filed?
23 A  Yes, ma'am.
24 Q  Do you recall filing the grievance?

Page 33

1  A  Yes, ma'am. See, usually we receive a whole copy of
2  this here down in Georgetown. Once you file a grievance,
3  you don't get anything back, no copies or nothing from the
4  original form that you filed, you know.
5  Q  Okay.
6  A  So everything that I have, I sent it in to you on
7  your request.
8  Q  Turn for a minute to the first page of the
9  grievance. And read out loud the section entitled,
10 Description of Complaint.
11 A  Inmate states that Correctional Officer Diaz struck
12 him in the back of the neck while making tier check and
13 never apologized or acknowledged me. I reported to Sergeant
14 Biles who said he would speak to CO, correctional officer.
15 Upon hearing this, Correctional Officer Diaz just laughed at
16 Sergeant Biles and kept walking.
17 Q  Okay. So do you recall filling out a grievance and
18 writing that?
19 A  No. Well, see, this is a synopsis of what they put
20 down. The grievance form was longer than this, you know,
21 longer than this here. Right. So this is done by the
22 grievance people that hear this here. They make a synopsis
23 here.
24 Q  So this isn't actually what you wrote?

Page 34

1  A  No.
2  Q  Do you recall what you wrote?
3  A  Yes, ma'am. It's what I explained to you in here.
4  But this time, they put it down to fill in the space, you
5  see.
6  Q  Okay.
7  A  They shortened it up like this here.
8  Q  Okay. Let's just go through this a little further.
9     According to this grievance report, what is the
10 incident date?
11 A  10:00 o'clock on here.
12 Q  No, not the time. The date.
13 A  Oh.
14 Q  Do you see the second column, the fourth row down?
15 A  Oh, yes, ma'am.
16 Q  What does that say?
17 A  September 1st. See, I mean this is the date that I
18 filed a grievance. That's how they write it.
19 Q  Now, why did you wait a couple of days after the
20 incident to file the grievance?
21 A  Well, actually, I sought advice from Iman, the
22 leader of the Muslims down there. See, I'm not like a type
23 of lawsuit filing guy, whatever, you know, grievance kind of
24 man, if you ever check my record. I'm not into that. So I

Page 35

1  sought the advice of Robert Saunders, who is like the
2  resident attorney and stuff like that, you know, paralegal
3  and stuff like that. So he told me that I should file a
4  grievance, you know. So that's what I did upon his advice.
5  Q  Well, according to the grievance, Officer Diaz hit
6  you on the back of the neck?
7  A  Yes.
8  Q  Your complaint, however, stated that he hit you on
9  the right side of the neck. Which is correct?
10 A  Well, this is what I'm saying. This is what they
11 have here, you see. But what I originally said here. You
12 don't have a copy of my original grievance?
13 Q  No. I have a copy of this. This grievance report.
14 A  Yeah. But I'm saying my original grievance, I have
15 where he hit me. Like I said, I was leaning forward. And,
16 actually, his whole right arm was all around here. He
17 didn't strike me on the back of my neck, you know.
18 Q  So in your original grievance, you claim you wrote
19 that he hit you on the right side of your neck?
20 A  Yes, ma'am. If you have the grievance here, I'll
21 explain that to them. Yeah.
22 Q  Could you please read, in the grievance, the section
23 entitled, Remedy Requested?
24 A  Yes, ma'am.

Page 36

1  Q  What does it say? Can you read it out loud?
2  A  No action requested.
3  Q  How come you did not ask for any remedy at the time
4  you filed your grievance?
5  A  What I'm trying to explain to you, Ms. Tross, is
6  once I filed a grievance, right, I filed a grievance and I
7  never heard anything back or whatever until after I was in
8  behavior modification where Lieutenant Smith came through
9  there and I explained to him. I knew Lieutenant Smith's
10 grandfather when I was down there in the sixties and I
11 explained to him what happened because he came there to hear
12 another grievance that I filed against Dukes and he said,
13 well, I can tell you you can take it before the grievance
14 board.
15    So I never kept any of this stuff here from
16 Lieutenant Attallian. Nothing. This is the first time I
17 seen all this here. That's how they wrote it up.
18 Q  So now at the beginning when you were talking about
19 what happened with the incident, you said that your
20 grievance was upheld?
21 A  Yes, ma'am.
22 Q  How do you know it was upheld?
23 A  Because I have the paperwork here that came back
24 from the Commissioner where it was upheld.

Page 37

1  Q  And what does it say in the paperwork?
2  A  It says, it is the Department of Corrections, Bureau
3  of Prisons. Dear Emanuel Redden: We have reviewed your
4  Grievance, Case 6534, dated September 1st, 2004. Based upon
5  the documentation presented for our review, we uphold your
6  appeal request. Accordingly, there is no further issue to
7  mediate nor outside review necessary as provided by BOP
8  procedure 4.4 entitled, Inmate Grievance Procedure, Level 3
9  appeals. Sincerely, Paul T. Howard, Bureau Chief.
10 Q  Okay. So according to that, he was upholding your
11 appeal request, correct?
12 A  Yes, ma'am.
13 Q  But it doesn't say he was upholding your grievance?
14 A  Yeah, that's what it means.
15 Q  Why did he say appeal request?
16 A  Well, I don't know why he said that. Because, see,
17 what happened, during the investigation when I had my
18 grievance hearing, the committee recommends an investigation
19 be conducted on this matter.
20    Now, if he didn't uphold a recommendation, he
21 would deny my appeal request, you see, for the
22 investigation, you see.
23    But by the committee upholding that, the
24 grievance board, you know, he upheld their decision. So an

EMANUEL W. REDDEN, JR.

Page 38

1  investigation did go on by Lieutenant Johnson. And I never
2  found out what happened or whatever because they locked me
3  up, put me in behavior modification and gave -- kept me
4  there for ten days, you know, 20 days in the hole. And then
5  put me over to medium. I never heard anything about it. I
6  never seen him again. Then they brought me up here March
7  1st, 2005.
8  Q    So you don't know the results of the investigation?
9  A    No, ma'am, other than what I received from the
10 bureau chief, Mr. Paul Howard.
11 Q    And who did you say was conducting the
12 investigation?
13 A    Lieutenant Johnson, George R. Johnson.
14 Q    And did Lieutenant Johnson ever come speak with you?
15 A    No, ma'am.
16 Q    How do you know he was doing an investigation?
17 A    Because Sergeant Campbell told me, you know. He
18 recently passed away, you know, last year.
19 Q    What did Sergeant Campbell tell you?
20 A    When I was in behavior modification, he came and
21 told me, because I was in for pretrial. He said, they are
22 investigating the situation. And that was it, you know.
23 Q    And who was Sergeant Campbell?
24 A    That was Gary Campbell, the guy that was in charge

Page 39

1  of the whole area where I was incarcerated at the time,
2  behavior modification, that was on this charge.
3  Q    What day did you begin your sentence in behavior
4  modification?
5  A    September 3rd of 2004.
6  Q    And why you were you put in behavior modification?
7  A    Because I filed another grievance prior to that
8  grievance against Sergeant Dukes.
9  Q    So you believe you were put in there because of the
10 fact that you filed grievances?
11 A    Yes, ma'am.
12 Q    There was no other reason?
13 A    No, ma'am.
14 Q    Did they claim that you did anything?
15 A    Well, I was making salat. It's called prayer.
16 Q    Can you spell salat?
17 A    S-a-l-a-t.
18 Q    Okay. So you were making salat?
19 A    Yeah.
20 Q    Which is prayer?
21 A    Yes, ma'am.
22 Q    And what happened?
23 A    About me being injured on my knee, I couldn't pray
24 regularly like I do on the floor. So I was sitting there

Page 40

1  with Playboy and another guy. I can't think of his name.
2  Because I just met the brothers. And was making salat. I
3  was following them because I was sitting in the tier. So
4  usually when count comes around, everybody was in the gym,
5  only three of us, four of us on the whole block. So the
6  guard would come by and count us right then and there to
7  keep on going.
8       So after I finished making prayer, Sergeant
9  Dukes came in on the tier and accused me of disrespecting
10 his officers by not sitting in my bunk during count or
11 whatever. And he came up on me and bumped me with his
12 belly, you know. And so I went over. He said, I'm locking
13 you up. So I went over there and started packing up my
14 stuff.
15 Q    Did you receive a writeup?
16 A    No, ma'am. I didn't receive anything until after I
17 filed a grievance against Sergeant Dukes. And then he
18 backdated the charge against me for group demonstration,
19 inciting a riot, to get me in behavior modification. That's
20 how I got over there on December 3rd.
21 Q    And when did you leave behavior modification?
22 A    I think September 13th. I stayed there ten days.
23 And then they put me in the hole for another 20 days.
24 Q    Why did they put you in the hole?

Page 41

1  A    Because they gave me 20 days for this charge of a
2  group demonstration or whatever.
3  Q    And what led to that charge?
4  A    Well, as we was praying, the young brother said, if
5  you're going to lock him up, you can lock us up, too. And
6  they wanted to pack up their stuff.
7       I said, no, I'm all right. I have this here.
8  You don't have to do this here. I've got this here.
9       So they said, you got too much power. If
10 security can't control another inmate and another inmate can
11 control another inmate, you have too much power, you see,
12 and gave me two charges of group demonstration for each one
13 of them.
14      And then the same day they came to get me, I
15 was on my way to prayer. The sergeant called me up the tier
16 and had the man around the corner with the big German
17 shepherd and everything. So I said, what are you going to
18 do, hang me now, you know. And he said, turn around and put
19 your hands behind your back and took me over to behavior
20 modification, you know. Yes, ma'am.
21 Q    You said you were in the hole for 20 days?
22 A    Yes, ma'am. I have been here locked up now for the
23 same charges, ma'am, almost two years now. Ever since the
24 incident, I have been locked up.

EMANUEL W. REDDEN, JR.

### Page 42

1  Q  Okay. Let's go back to the injuries you claimed you
2  received as a result of the incident with Officer Diaz.
3       What specific injuries do you claim that you
4  received as a result of the incident?
5  A  Well, right after the incident, see, I filed a
6  grievance September 1st, as it says on there. They locked
7  me up September 3rd. And when I was in behavior
8  modification, that's when I started having problems with my
9  neck.
10 Q  What type of problems?
11 A  It swelled up and it was aching. So when they
12 called me out to see the nurse, because I was going to see
13 the nurse in the morning and the evening while they was
14 fixing my leg, changing the bandage on my knee, that's when
15 I complained about my neck, the pain and stuff in my neck.
16 And she told me it probably come from the hair follicles in
17 my head. And I explained to her, I said, no, it ain't
18 coming from my hair follicles in my head. I said, I was
19 injured. I was hit on the right side of my neck. That's
20 why my neck is swelling up.
21 Q  So did you ever fill out a sick call slip for your
22 neck pain?
23 A  No, ma'am. Because I didn't have to. Because I was
24 going over there to the infirmary twice a day, in the

### Page 43

1  morning at 9:00 o'clock and in the evening around 5:00
2  o'clock.
3  Q  And when was the first time you spoke with a nurse
4  about the pains in your neck?
5  A  September -- let me see. It was around the 4th or
6  the 5th. I'm not certain.
7  Q  But you believe it was around the 4th or 5th?
8  A  Yes, ma'am. I know it was after I was locked up
9  September 3rd, 2004, while I was in behavior modification.
10 It was either that next day, September 4th, when I went
11 around there to have my knee treated and everything.
12 Q  When was the first time that you saw a doctor for
13 the pain in your neck?
14 A  Around September 4th.
15 Q  So you saw both a nurse and a doctor?
16 A  No. It was a nurse. You don't see no doctor like
17 that.
18 Q  So you never saw a doctor for your neck pain?
19 A  No, ma'am.
20 Q  What treatment did you receive for your neck pain?
21 A  She didn't give me no treatment.
22 Q  Were you prescribed any medication for your neck
23 pain?
24 A  No, ma'am. I don't take medication.

### Page 44

1  Q  When did your neck start to get better?
2  A  I said the pain only lasted about maybe a couple
3  days, you know, three days at the most, you know, before the
4  swelling went down or whatever, you know.
5  Q  Are you currently receiving any treatment for your
6  neck pain?
7  A  No, ma'am.
8  Q  When was the last time you filled out any sort of
9  sick call slip for your neck pain?
10 A  I never did.
11 Q  Okay. And when was the last time you saw a nurse or
12 a doctor for your neck pain?
13 A  That same day when I was there, you know, in
14 behavior modification, you know.
15      MS. TROSS: Could you please mark this as
16 Defendant's Exhibit No. 3?
17      (Defendant's Deposition Exhibit No. 3 was
18 marked for identification.)
19      THE WITNESS: I didn't even remember filing
20 this.
21 BY MS. TROSS:
22 Q  Exhibit No. 3 is a sick call slip.
23 A  See, that's what happens when you get old. You
24 don't remember everything.

### Page 45

1  Q  Have you ever seen this document before?
2  A  It happened in pretrial. I don't remember it. But
3  it is my signature and everything on there.
4  Q  So this is your signature?
5  A  Yes, ma'am.
6  Q  Does this sick call slip relate to the injuries you
7  claim you received on August 28, 2004?
8  A  Yes, ma'am.
9  Q  Could you please read the date submitted listed in
10 the sick call slip?
11 A  9/27/04.
12 Q  So you filed this slip on September 27, 2004?
13 A  Yes, ma'am.
14 Q  Approximately one month after the incident occurred?
15 A  Yes, ma'am.
16 Q  Okay. Could you please read the comment section in
17 the sick call slip?
18 A  I got struck in the neck last month and now a knot
19 has grown up on it.
20 Q  So according to the sick call slip, approximately
21 one month after you claim you were hit in the neck, you had
22 a knot grow on your neck, is that correct?
23 A  Yes, ma'am.
24 Q  Do you recall when you first discovered the knot?

Page 46

1  A  Like I said, I was in behavior modification. And
2  they just said it was swollen glands.
3  Q  Do you remember when you first saw the knot or first
4  felt the knot?
5  A  Yes, ma'am. Around September 4th or the 5th.
6  Q  But you didn't submit the sick call slip until
7  September 27th?
8  A  The pain was there. So that's when I filed a
9  grievance. I mean the sick call slip. I don't even
10 remember filing it because of behavior modification.
11 Q  Is PT 418, is that behavior modification?
12 A  That's pretrial, 418.
13 Q  Is that behavior modification?
14 A  Well, behavior modification. And all that is in
15 pretrial. So 418, yes, ma'am, that's behavior modification.
16 Q  Okay. Do you recall how big the knot on your neck
17 was?
18 A  Well, it was a swollen gland and that's what the
19 lady said. It was due to the hair follicles in my head.
20 She explained that whenever you have problems with your hair
21 follicles, it makes your glands swell up. The gland was
22 about right here that was swelling up. It was about the
23 size of a quarter. It is just a piece that is still there.
24 It never really went away.

Page 47

1  Q  So according to the nurse, this wasn't because of
2  Officer Diaz allegedly hitting you, this was because of your
3  hair follicles?
4  A  See, I didn't sell tell her I was struck in the neck
5  first. I told her my neck was swelled up. She said, it was
6  in your hair layer. I said, no, I was struck in the neck.
7  Q  And then what did she say?
8  A  She didn't say anything, really.
9  Q  But according to her, this was from swollen glands
10 from your hair follicles?
11 A  That's what she said, a possibility from that. She
12 never looked in my head or nothing, you know. She was
13 giving me her understanding of why the glands in the neck
14 swelled up, you know. She said it come from the hair
15 follicles in your head.
16 Q  Did the knot on your neck hurt?
17 A  Yes, ma'am, it hurt.
18 Q  Did the medical department see you after you filed
19 this sick call slip?
20 A  Yes, because they came and took me over there.
21 Q  What day?
22 A  Evidently -- I can't remember the day on here.
23 Because I didn't even remember filing this. Well, if I
24 filed this here the 27th, it had to be around the 28th or

Page 48

1  29th because they don't play when you file a sick call.
2  They come and get you. So right here, she got, provider
3  signature 9/27/04. That's what day she have on here.
4  Q  So do you remember being seen by the medical
5  department on September 27th?
6  A  I remember being seen by Jill.
7  Q  And when you went, that's when she told you that
8  that was a swollen gland?
9  A  Yes, ma'am.
10 Q  Did they prescribe you any medication?
11 A  No, ma'am. I told you, I don't take medication. My
12 mother died from medical malpractice, you know, from
13 medication, you know, when I was young. So I won't take any
14 medication at all.
15 Q  Did they tell you to do any type of treatment?
16 A  No, ma'am. There wasn't, you know, after she said
17 what she said, once they said what they say, that's it, you
18 know. Ain't no questions. Remember, I'm inferior to them.
19 That's how their position is.
20 Q  So it is possible that the knot was from something
21 other than Officer Diaz hitting you?
22 A  No. I explained to her. I said, no, it didn't come
23 from no hair follicles because I didn't have any problems
24 with my head, you know. I said, I got hit on the neck, you

Page 49

1  know.
2  Q  But she never said anything to you after you told
3  her you got hit on the neck?
4  A  No. She started focusing on my knee, you know.
5  Q  Okay. Now, your medical records indicate that you
6  have a history of keloids on your head. Is it possible that
7  the knot on your neck had something to do with your keloids?
8  A  No, ma'am. I've got the keloid when I had an in-
9  grown hair cut out. That's how I got the keloid. They just
10 took this scar tissue off this past April. The doctor did.
11 So that didn't have nothing to do with my neck. I got my
12 hair cut with some dirty clippers here.
13 Q  And when did you first have problems with the
14 keloids?
15 A  Well, I came from out of state back in June 2000.
16 And a guy was giving me a close shave and I had these in-
17 grown hair on my head. I told him, I have had in-grown
18 hairs, could you please take them out. By the in-grown hair
19 being so long, it affected my head. So in August 2001, they
20 brought me over to the infirmary and cut it out. By the
21 time I got back over here, the stitches busted. And so they
22 said I got to file a sick call.
23     So when I filed a sick call, they called me a
24 week later and the thing was healing up then, you know. So

Page 50

1  it turned into a big piece of scar tissue.
2  Q  When did the stitches bust?
3  A  The same day that I had the operation on my head.
4  Q  So this was in August 2001?
5  A  Yes, ma'am.
6  Q  Okay. All right. Let's discuss the damages you're
7  asking for in your lawsuit.
8  A  Yes, ma'am.
9  Q  According to your complaint, you're requesting
10 $8,500 in compensatory damages?
11 A  Yes, ma'am.
12 Q  How did you arrive at that number?
13 A  Well, because I arrived at that number basically
14 because I think that was a low amount, you know, for the
15 incident and because of the intentions behind it and because
16 of the whole scenario of this whole conspiracy against me,
17 you know, that was led by Sergeant Dukes and the rest of the
18 officers in his command. So that's why I did that. Because
19 I was subjected to cruel and unusual punishment, you know,
20 and I was assaulted by this officer. And that's why I did
21 that.
22 Q  Do you have any medical bills as a result of any
23 injury you claim you suffered?
24 A  No, ma'am.

Page 51

1  Q  Were you unable to work as a result of any injury?
2  A  I wasn't working at all anyway.
3  Q  According to your complaint, you're requesting
4  $10,000 in punitive damages?
5  A  Yes, ma'am.
6  Q  How did you arrive at that number?
7  A  Because he should be punished for that, you see.
8  Because that's the mindset of them officers down there, with
9  Sergeant Dukes, you know. Sergeant Dukes is very racist and
10 any officers under his command that go against his like
11 control or whatever, there is a problem, you see.
12      I have been in the system 30 years. And the
13 mindset of Sergeant Dukes and them down in Georgetown, they
14 are very violent, very aggressive and they beat inmates down
15 there on a regular basis down in Georgetown, you see. And
16 that's why he was bumping me and trying to provoke me into
17 hitting him because of my past record of violence against
18 the officers. Because when I came here when I was young, I
19 had a real sordid history against the officers here and they
20 stepped it back.
21      When I came in the sixties when I was in the
22 Black Panther Party. It was the mindset of the officers
23 here in the south. This is the south and it was real racist
24 here, you know. And so I picked up some assault charges and

Page 52

1  stuff in the penitentiary fighting against the officers, you
2  know. So they thought I still had the mindset when I came
3  back from out of state. But my whole mindset has changed as
4  I became Muslim and grown, you see.
5       I started using the pen. I stopped using my
6  hands and started using the pen. That's when I filed the
7  grievance.
8       MS. TROSS:  Okay. I have one last exhibit we
9  are going to discuss.
10      Can you please mark this as Defendant's Exhibit
11 No. 4?
12      (Defendant's Deposition Exhibit No. 4 was
13 marked for identification.)
14 BY MS. TROSS:
15 Q  Okay. Defendant's Exhibit No. 4 is your response to
16 Defendant's Combined First Set of Interrogatories and
17 Requests for Production of Documents. Take a moment to
18 review it.
19 A  You can try to whip me with all this stuff, too,
20 now. You need to go in private practice. Okay.
21 Q  Okay. Have you ever seen this document before?
22 A  Yes, ma'am.
23 Q  And are these your responses to Defendant's Combined
24 First Set of Interrogatories?

Page 53

1  A  Yes, ma'am.
2  Q  Okay. Let's turn for a moment to page number six,
3  interrogatory number three. And in interrogatory number
4  three, I asked you for every communication you have had with
5  anyone other than your attorney concerning the alleged
6  incident. And you answered that it was unavailable.
7      What communications are you referring to that
8  are unavailable?
9  A  Well, none, really.
10 Q  So there aren't any?
11 A  No. Other than what I gave you.
12 Q  Which is --
13 A  The grievance form that I gave you, you know,
14 recommendation and that stuff here.
15      Excuse me. When I was talking unavailable, I
16 was talking about the results of the investigation and stuff
17 like that. The documents and stuff that I have, that is
18 what I meant. I didn't know if this was going to come in
19 while this was being processed or not. I didn't know what
20 was going to happen so I left it unavailable. In case
21 something came in, I left myself open so I could give it to
22 you.
23 Q  Did you ever receive the results?
24 A  No, ma'am. Because I was going to get the forms

14 (Pages 50 to 53)

Page 54

1  that you just showed me from my original grievance and
2  stuff. I never got anything.
3  Q  Okay. And the next interrogatory, interrogatory
4  number four, I asked you for every communication you have
5  had with the defendant concerning the alleged incident. And
6  you said that the communication was unavailable. What
7  communication are you referring to?
8  A  None.
9  Q  So there wasn't any communication with the
10  defendant?
11  A  No. I was just keeping myself open just in case I
12  got them documents in. That's what I was waiting on.
13  Q  Okay. Let's turn to page seven. Interrogatory
14  number six, I asked you for any prior or subsequent
15  grievances you filed concerning any and all interactions
16  with the defendant and you said that the grievances were
17  unknown. Do you now know what grievances you filed against
18  the defendant?
19  A  No, ma'am. Other than what I originally filed.
20  Q  So there is no other grievances?
21  A  No.
22  Q  All right. Let's turn to page number eight.
23  Interrogatory number eight, you state that the inmates York
24  and Salisbury witnessed the incident.

Page 55

1  Again, you don't know the actual names of the
2  two inmates who were seated with you at the card table?
3  A  No, ma'am. They could find them down there.
4  Sergeant Biles and them, all the officers and everybody know
5  them by that, their names.
6  Q  So York and Salisbury, that's their nicknames?
7  A  Yes, ma'am.
8  Q  And it's according to where they are from?
9  A  Yes, ma'am.
10  Q  Okay. In interrogatory number nine, you state that
11  you were already receiving daily medical attention for a
12  prior injury.
13  Could you please explain what the prior injury
14  was?
15  A  When I went down to Georgetown and moved over into
16  Dukes' building, Sergeant Dukes came in there. They had a
17  big meeting after this guy got killed up here. In July of
18  2004, they moved me from maximum security down there to
19  medium. So when I'm in there, Sergeant Dukes come in there
20  and shake my hand and everything. Because after the
21  incident came up, they went through everybody's record and
22  everything. So they had a big meeting down there and they
23  informed him of my assaultive history and everything, you
24  know.

Page 56

1  So when I got over there to medium, everybody
2  said, what are you doing over here, he should be in max, you
3  shouldn't be walking around here. So I'm putting myself on
4  the top bunk and Sergeant Dukes come in and shaking my hand
5  and everything and then introducing himself, you know.
6  Everybody says, man, that's the first time he ever come in
7  here and shook somebody's hand and all that there. So, you
8  know, I said, okay, well, you know, it ain't nothing.
9  So they got me on the top bunk and the top bunk
10  meant I was security screen, not a regular bunk. There was
11  tack weld there so the edges wasn't filed there. It was a
12  security screen, you know, like would be placed on windows
13  or something like that, you know. And the edges wasn't
14  filed down.
15  As I was climbing up on the bunk, a piece of
16  edge went into my left knee. And so a boil came up on my
17  knee. And then it busted. And it started draining. My leg
18  swelled up real bad.
19  So I asked them for some medical attention, you
20  know. And they refused me medical attention for about five
21  or six days. My leg swelled up and everything. So I was
22  going over there to receive treatment for that.
23  Q  Okay. And what type of daily medical attention were
24  you receiving?

Page 57

1  A  Well, what happened after I injured my leg, they
2  kept me from sick call for so long, after filing sick calls
3  and everything to get over there, the poison in my knee
4  started eating down to my bone.
5  Q  The what in your knee?
6  A  The poison. The infection. So what happened there,
7  I had to get my knee washed every day and they had to take
8  some type of material and stuff it down in my knee and leave
9  it there and get it pulled out with a knife so they could
10  pull the pus and everything out because they didn't want the
11  top of my knee to close up before the bottom part was
12  cleaned out. So I had to get daily treatment for this and
13  get my knee washed and measured and everything like that.
14  Q  In interrogatory number ten, and we are still on
15  page eight, I asked you for each document in your possession
16  and control that relate to the injuries you allegedly
17  sustained from the alleged incident.
18  And you answered that documents were
19  unavailable.
20  What documents are you referring to?
21  A  The same ones that you just showed me about my
22  results of my grievance and everything down in DC.
23  Q  The results of your grievance?
24  A  Yes, ma'am. Like I said, the standard procedure is

Page 58

1  you get a copy of all of that. But I never got a copy of
2  anything other than what I gave you.
3    Q  Okay. Let's flip to page ten, interrogatory number
4  13. You state that, after filing your grievance, you were
5  locked up in a behavioral modification unit as an act of
6  retaliation?
7    A  Yes, ma'am.
8    Q  Again, can you just explain when you were locked up
9  in the behavior modification unit?
10   A  September 3rd. September 3rd.
11   Q  And how long were you locked up there?
12   A  They kept me for ten days.
13   Q  So until September 13th?
14   A  Around that time. Then they moved me across the
15 hall to the hole to do the 20 days for the inciting a riot.
16   Q  So you stayed in the hole until approximately
17 October 3rd?
18   A  Around that time. Yes, ma'am, I believe.
19   Q  Okay. All right. Have you ever spoken with or
20 written to Officer Diaz regarding the incident?
21   A  No, ma'am.
22   Q  Have you ever spoken with or written to him
23 regarding the injuries you claim you received?
24   A  No, ma'am.

Page 59

1    Q  Are there any grievances in addition to the one we
2  discussed earlier regarding your injuries?
3    A  No, ma'am.
4    Q  Do you have any documents in your possession or
5  control besides the ones that we discussed that relate or
6  discuss the injuries you claim you sustained on August 28th?
7    A  No, ma'am.
8    Q  Prior to August 28, 2004, have you ever suffered any
9  injuries to your neck?
10   A  Back in 1982, I got shot through the neck.
11   Q  So 1982, you were shot in the neck?
12   A  Yes, ma'am.
13   Q  Did you keep any sort of journal or diary or log
14 where you described or detailed the incident that occurred
15 on August 28th?
16   A  No, ma'am.
17   Q  Did you keep any sort of journal, diary or log where
18 you described or detailed the injuries you claim you
19 received on August 28th?
20   A  No, ma'am.
21   Q  Okay. Now we are going to briefly discuss your
22 criminal history.
23         For what crime are you presently incarcerated?
24   A  When I originally came to jail for?

Page 60

1    Q  Yes.
2    A  Robbery.
3    Q  And when did your present incarceration begin?
4    A  In December '77. 1977.
5    Q  And what sentence did you receive for robbery?
6    A  They gave me three years for the robbery charge and
7  ten years for the same gun. I got two five year charges.
8    Q  So two five year charges for having a gun?
9    A  Yes, ma'am. Consecutive it was, which is mandatory.
10   Q  So that's only 13 years.
11   A  Yes, ma'am.
12   Q  So why are you still incarcerated?
13   A  Well, I told you, ma'am. The officers has been
14 assaulting me, jumping me and I picked up the time in here.
15   Q  Okay.
16   A  In prison.
17   Q  Were your original criminal charges for robbery
18 resolved by plea or by trial?
19   A  By trial.
20   Q  Approximately how much of your adult life have you
21 spent incarcerated?
22   A  The majority of it.
23   Q  Have you ever been convicted of a crime of
24 dishonesty besides robbery, such as perjury?

Page 61

1    A  No, ma'am.
2    Q  Have you ever been found guilty of any disciplinary
3  violations while incarcerated, which in any way involved
4  dishonesty?
5    A  No, ma'am.
6    Q  Were you ever involved in smuggling contraband into
7  SCI?
8    A  No.
9    Q  Were you ever involved in smuggling contraband into
10 Delaware Correctional Center?
11   A  No, ma'am.
12   Q  Have you ever approached any correctional employee
13 in an effort to convince them to help you smuggle contraband
14 into Sussex Correctional?
15   A  No, ma'am.
16   Q  And have you ever approached any correctional
17 employee in an effort to convince them to help you smuggle
18 contraband into Delaware Correctional Center?
19   A  No, ma'am.
20   Q  I have a few final questions. Do you intend to call
21 any witnesses if this case goes to trial?
22   A  Yes, ma'am.
23   Q  And who are they?
24   A  Salisbury and New York.

EMANUEL W. REDDEN, JR.

Page 62

1  Q  Anyone else?
2  A  Sergeant Biles. And John Doe. But they know who he
3  is. Lieutenant Johnson know who he is. That was the
4  officer that was with Sergeant Biles when I told Sergeant
5  Biles about this guy assaulting me. Because when he was at
6  the grievance hearing, they discovered his name, Lieutenant
7  Johnson did, and he said I'm going to investigate him as the
8  investigation went on. You know, he said we are going to
9  talk to Sergeant Biles and talk to him to find out, you
10 know.
11 Q  So when you talked to Sergeant Biles about Officer
12 Diaz, there was another officer present?
13 A  Yes, ma'am.
14 Q  And you're calling the Officer John Doe?
15 A  Yes, ma'am. But Lieutenant Johnson, he know who he
16 is. Because when I was at the grievance hearing, they was
17 coming over two different names because I was describing
18 what the guy looked like, you know. So Lieutenant Johnson
19 knew him from the description. I forgot his name, who he
20 said he was.
21 Q  Do you intend to call any expert witnesses if this
22 case goes to trial?
23 A  I'm going to call Jill Mosser, the one that I filed
24 a grievance to. The one I was going to see about my knee.

Page 63

1  Q  Anyone else?
2  A  No, ma'am. That should be it.
3  Q  Okay. And what do you expect Jill Mosser to testify
4  to?
5  A  The same thing that I told you that I told her my
6  neck was hurting, injured, you know.
7  Q  And going back for a moment. What do you expect
8  Mr. York, we'll call him, to testify to?
9  A  That I was struck.
10 Q  But you said before he didn't see that you were
11 struck, correct?
12 A  He didn't see me being struck.
13 Q  Right.
14 A  But he heard me say, I said, man, this guy just hit
15 me.
16 Q  Okay.
17 A  You see, they was there. He just told them he
18 struck me, you know.
19 Q  And what do you expect Salisbury to testify to?
20 A  The same thing.
21 Q  And what do you expect Sergeant Biles to testify to?
22 A  What I told him and whatever came out of the
23 conversation with Officer Diaz because Officer Diaz never
24 denied hitting me. When he was telling the superior officer

Page 64

1  that he hit me, he never denied, just snickered and laughed.
2  Sergeant Biles said, I'm going to talk to you in the office.
3  Q  And what do you expect Officer John Doe to testify
4  to?
5  A  The same thing. Because he went in the office with
6  him, you know. All three of them went in the office.
7  Q  Okay. At this time, would you like to change your
8  answer to any question that was asked?
9  A  Not really. The only thing I would acknowledge is,
10 I didn't recall the sick call that I filed.
11 Q  That you don't remember filing a sick call slip?
12 A  No. Because I was in a lot of stress, ma'am, you
13 know.
14 Q  Okay, Mr. Redden, that concludes my questioning.
15 You're permitted at this time to make a statement in
16 response to the case. You may not ask me any factual or
17 legal questions because I'm not a party to the case. So is
18 there anything else that I should know in order to
19 understand what happened?
20 A  Well, in what form are you talking about anything
21 that you should know?
22 Q  Is there anything that you would like to add that we
23 didn't discuss or anything that you would like to clarify
24 that we did discuss?

Page 65

1  A  No.
2  Q  Okay. The court reporter is going to prepare a
3  transcript of this deposition. A transcript, as you may be
4  aware, is a typed document that contains everything that was
5  said on the record during this deposition. The transcript
6  can be used for preparing a motion for summary judgment or
7  for use at a trial should we have one in this case. The
8  transcript is available for purchase. But because you're
9  proceeding informa pauperis, I will send you a copy of the
10 transcript after the defendant receives a copy. You then
11 have the opportunity to review the transcript for errors.
12 You do not, however, have to review the transcript if you do
13 not want to.
14    Do you wish to obtain a copy of the transcript
15 and review it for errors?
16 A  Yes, ma'am.
17 Q  Okay. I intend to file a motion for summary
18 judgment within the coming weeks in this matter. A motion
19 for summary judgment submits this matter to the judge for a
20 decision on whether you can present genuine and material
21 issues of fact that will require a trial. The standard for
22 summary judgment is not the same as a standard for a motion
23 to dismiss and will likely require that you demonstrate the
24 actual support for your allegations.

**Page 66**

1 Once I file my motion, you are then permitted
2 to file an answering brief. If you file an answering brief,
3 I have the ability to file a reply brief. This will then
4 conclude the briefing process for my summary judgment
5 motion.
6 Do you have any procedural questions you would
7 like to ask me? But please understand that I cannot provide
8 you legal advice. Do you have any procedural questions?
9  A   You know I'm locked up in here. I don't have access
10 to a law library or anything. Only through paper writing,
11 you know.
12  Q   Okay.
13  A   So I wouldn't even know how to respond to your
14 summary judgment.
15  Q   Well, what you could do is, once you receive my
16 summary judgment motion, the court has then given you a
17 certain amount of time to answer. You could then take it to
18 the law library or submit a copy to the law library for
19 assistance in responding. And they should be able to help
20 you with that.
21  A   The guy here, they don't do it like that.
22  Q   Okay. Well, then I would say just file a response
23 to the best of your ability.
24  A   Okay.

**Page 67**

1  Q   Do you have any other procedural questions?
2  A   Well, no.
3  Q   No?
4  A   No, ma'am, I guess.
5       MS. TROSS: Okay. So that concludes this
6 deposition.
7       (Deposition concluded at 11:28 a.m.)

**Page 68**

INDEX
DEPONENT: EMANUEL W. REDDEN, JR.        PAGE
Examination by Ms. Tross                 2


EXHIBITS

DEFENDANT'S DEPOSITION
NUMBER       DESCRIPTION         MARKED
1   Form to be Used by a Prisoner in    24
    Filing a Complaint Under the Civil
    Rights Act, 42 U.S.C. 1983
2   Grievance Report                    32
3   Delaware Department of Corrections  44
    Request for Medical/Dental Sick
    Call Services
4   Defendant's Combined First Set of   52
    Interrogatories and Requests for
    Production of Documents Directed
    to Plaintiff

**Page 69**

18 (Pages 66 to 69)

Page 70

```
 1
 2
 3      REPLACE THIS PAGE
 4      WITH THE ERRATA SHEET
 5      AFTER IT HAS BEEN
 6      COMPLETED AND SIGNED
 7      BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 71

1  State of Delaware )
                    )
2  New Castle County )
3
4           CERTIFICATE OF REPORTER
5
        I, Allen S. Blank, Registered Merit Reporter and
6  Notary Public, do hereby certify that there came before me
   on the 17th day of January, 2007, the deponent herein,
7  EMANUEL W. REDDEN, JR., who was duly sworn by me and
   thereafter examined by counsel for the respective parties;
8  that the questions asked of said deponent and the answers
   given were taken down by me in Stenotype notes and
9  thereafter transcribed by use of computer-aided
   transcription and computer printer under my direction.
10
        I further certify that the foregoing is a true and
11 correct transcript of the testimony given at said
   examination of said witness.
12
        I further certify that I am not counsel, attorney,
13 or relative of either party, or otherwise interested in the
   event of this suit.
14
15
16
17      Allen S. Blank, RMR
        Certification No. 103-RPR
18      (Expires January 31, 2008)
19
   DATED: January 24, 2007
20
21
22
23
24